(No. 87-CC-1806

BERNIE J. GILDEHAUS, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed June 30, 1993.*

*Order filed September 21, 1993.*

CHADWICK KASTEN, for Claimant.

ROLAND W. BURRIS, Attorney General (THOMAS GRAY, Assistant Attorney General, of counsel), for Respondent.

## OPINION

FREDERICK, J.

Claimant, Bernie J. Gildehaus, in this tort action, seeks recovery from the State of Illinois for personal injuries he allegedly received in an automobile accident which occurred on September 11, 1986. The accident occurred when Claimant was operating his 1976 Pontiac vehicle westbound on Lincoln Highway at its intersection with North Illinois Street in Fairview Heights, St. Clair County, Illinois. Claimant was attempting to make a left turn and proceed south on North Illinois Street. The Respondent's agent was operating a State truck immediately behind the Claimant, proceeding in the same direction.

Claimant testified that he was on his way to the grocery store with his wife and children and was in the left-hand lane expecting to turn left. There were several cars in front of the Claimant. When the light turned green, one of the cars in front of Claimant at the intersection stalled out, for a few seconds, but finally went through the intersection.

By the time the Claimant proceeded to the actual intersection, the traffic control light turned yellow and the Claimant hit his brakes. Respondent's truck then

struck Claimant's vehicle in the rear. The Claimant testi-
fied his body went forward and on impact, he broke the
turn signal switch off and hit the panel. Claimant discov-
ered he had been hit by an orange State of Illinois truck
being operated by Respondent's agent. The damage to
the rear of Claimant's car is shown in two photographs
admitted into evidence. The damage appears to be ex-
tremely slight. The only damage appears to be a small
dent about a foot from the trunk key hole, however the
damage resulted in the car being "totaled" as far as
Respondent's payment for damages to the vehicle was
concerned. The damages were $453 and the car was only
valued at $500.

The police were not summoned to the accident
scene. At the time of the accident, Claimant was not hurt
and didn't feel the need to call the police. The Claimant
testified that the next day he went down and made out a
police report at the police station with his wife.

Claimant continued to work after the accident. He
worked all but two days between the 11th and 28th of
September. He also worked for four days in November.
Claimant's job was at Steak 'n Shake as a maintenance
man and this job involved some lifting. Claimant testified
he had pain from his neck to his feet so he went to a
physician. Claimant first saw Dr. Naguit on September
30, 1986, nineteen days after the accident. This was the
first doctor he saw after the accident. Dr. Naguit is a gen-
eral practitioner. Claimant's main complaint of pain was
involving the Claimant's neck.

Claimant denied ever having had any problems with
his back or any problems doing his job prior to the acci-
dent. Dr. Naguit prescribed physical therapy for Claimant,
but Claimant denies that it did any good. Claimant contin-
ued treating with Dr. Naguit, who referred Claimant to

Dr. Murphy, a physician whose specialty is neurological surgery. Dr. Murphy originally tried to put Claimant through a "work hardening program" which Claimant did not complete. In May of 1988, Dr. Murphy admitted Claimant to the hospital and put metal plates and bolts in Claimant's back. The hardware was removed upon Claimant's rehospitalization in 1990. Claimant wears a back brace. Claimant stood up during the hearing before the Commissioner because, he testified, that every time he sits, it cuts off circulation in his left leg and causes pain.

Claimant testified he experiences pain every day which is a sharp pain going from his neck to his lower back and legs, as though somebody stabbed Claimant with a knife.

Claimant has been treated once or twice a month with spinal blocks since the accident. Claimant has never been released to return to work by his doctors since the time he started treatment.

At the time of the hearing, Claimant was 36 years of age and he was married with three children, aged four, six and nine. Claimant attended school for nine years. His first job was at a cemetery digging graves with his father. Claimant began working at the Steak 'n Shake Restaurant in 1976 for $1.90 per hour. At the time of the accident, Claimant was a general maintenance man working the midnight shift at Steak 'n Shake making $4.50 per hour. Claimant testified that he received approximately a $.25 per hour raise each year. Prior to the accident, Claimant had done odd jobs for extra money, including work at an auto sales agency as an auto mechanic and he also did body work. Claimant also continued to dig graves. Claimant's wage information showed that in 1986, he made slightly more than $6,000 prior to the accident, but that he did not include money from the car agency or digging graves or

other odd jobs. The evidence showed that in 1982, Claimant made $10,428; $9,816.99 in 1983; $9,735.67 in 1984; and $8,516.52 in 1985.

After the accident, Claimant testified he attempted to return to work but just couldn't "do it." Claimant testified that his personal life with his wife has also been affected by his injuries. Claimant is able to drive a car for about an hour and a half until he has to pull off the road. At the time of the hearing Claimant was still taking large amounts of medication. Claimant testified that nothing anybody had done for him had helped him after his surgery. Claimant further testified, without objection, that his medical bills totaled $64,613.88. A portion of these bills had been paid by the State of Illinois.

Respondent's cross-examination of the Claimant elicited that Claimant's job as a maintenance man and gravedigger involved heavy lifting.

Dr. Michael Murphy, the specialist, testified that he diagnosed Claimant's condition as spinal stenosis. Spinal stenosis is a condition in which there is a congenital decrease in the cross-sectional area of the canal through which the nerve roots travel in the lower portion of the lumbar spine. Dr. Murphy's opinion was that the spinal stenosis probably pre-existed the automobile accident of September 11, 1986. As congenital usually means "from birth," this opinion is well taken.

In response to Claimant's counsel's question, "Doctor, do you have an opinion you can state to a reasonable degree of medical certainty as to whether the automobile accident aggravated the pre-existing condition," the Claimant's specialist responded, "I think it's possible that it could have aggravated the pre-existing condition." Dr. Murphy gave no basis for this opinion. According to Dr.

Murphy, Claimant probably had the condition long before the accident. The MRI of July 7, 1987, shows degenerative disc disease at L2-3 and L5-S1 without evidence of herniation.

By February of 1988, Claimant had an 11-month history of claudification. He had extensive stenosis for such a young man. Dr. Murphy performed a laminectomy on Claimant on May 25, 1988. This was to take the pressure off of the nerves in the nerve canal. He did a fusion along with the laminectomy. Dr. Murphy certainly hoped Claimant would not need any further surgery. Dr. Murphy is not sure when Claimant could return to work. When he does return to work, he will not be able to lift over 50 pounds. Dr. Murphy testified Claimant had a temporary permanent disability. Dr. Murphy's final diagnosis was spinal stenosis and degenerative disc disease. Dr. Murphy made no mention of a herniated disc.

On cross-examination, Dr. Murphy admitted that no one had ever described the accident to him or had shown him any pictures of the Claimant's vehicle after the accident. Dr. Murphy had no idea as to a percentage of the extent this accident may have aggravated the pre-existing condition. Dr. Murphy had no idea as to whether the degenerative disc disease was a pre-existing condition. He did not know if a rear-end collision which caused a slight dent in the rear of Claimant's car would cause degenerative disc disease. Dr. Murphy filed a lien for his fees in the sum of $10,895.

Dr. Naguit, the general practitioner, testified that on September 30, 1986, Claimant gave a history of denying any injuries at the time of the accident. On October 8, 1986, Dr. Naguit formed a diagnosis of acute cervical strain. On November 28, 1986, the diagnosis was acute low back pain. This doctor further testified that,

"This condition that he had in May of 1988, whether aggravated or whether it was brought on by the accident, that is the spinal stenosis that he had between L2, L3 and L4 was most likely aggravated by the accident and this herniated disc at L2 and L3 was probably brought on by that accident."

The specialist's testimony and the general practitioner's testimony are contradictory. The earlier MRIs did not show a herniated disc. Dr. Naguit relied heavily on the history given by Claimant and the subjective complaints of Claimant. Dr. Naguit had no past medical records of Claimant. Dr. Naguit's testimony and the credibility thereof can best be tested in the light of his testimony concerning advising Claimant to go to the Mayo Clinic for further treatment. Dr. Naguit testified he did advise Claimant to go to the Mayo Clinic for further treatment. His rationale was that he had treated Claimant for three years and Claimant had surgery, all with no relief. It would be Claimant's "best bet" to get another opinion and go to Mayo Clinic. Dr. Naguit went on to testify as follows:

"° ° ° I've had patients that I've sent across the river to be seen at Barnes and St. Louis U and they spent all that money and don't get any relief, and then I send them over to Mayo Clinic and in just one visit they get the correct diagnosis and correct treatment, and they're more happy about it and considering that he has had all the possible treatments, including surgical intervention for him, I think by telling him to go across the river, he'll probably spend some more money without getting any relief. So I feel that if I want the patient to get the ultimate in treatment and diagnosis after having had no relief for the last three years, it is imperative that I refer him to a clinic which, in my own opinion, is probably superior to any place in the country, and that's why I told him to go to Mayo Clinic."

This testimony causes this Court to give less weight to the testimony of Dr. Naguit for the reasons set forth in this quoted passage of testimony and for the reason that the specialists' opinions differ. It is important to note that Dr. Naguit never gave a basis for any of his opinions. The bare opinions standing alone do not support a finding of causation in regard to the back injury and spinal stenosis. A close review of the doctors' depositions shows that Claimant's major complaints related to a neck injury on

September 30, October 8, October 15, November 7, and November 21, 1986. The very first complaint of lower back spasm was at the hospital on November 28, 1986. There had been no complaints of back pain prior to November 28, 1986, nearly two and one-half months after the accident. The diagnosis on November 28, 1986, was acute low back pain.

In December of 1986, Dr. Murphy thought Claimant had a chronic problem with muscle strain in the paraspinous muscles and in the truncal muscles. On July 7, 1987, an MRI showed degenerative disc disease of Ls-2 and L5-S1 *without* evidence of herniation. (Emphasis added.) A subsequent MRI on December 14, 1987, showed no significant change from the prior MRI and again was "without evidence of herniation." Dr. Murphy, the specialist, did not diagnose a herniated disc.

The Respondent called no witnesses and offered no testimony in support of Respondent's case. As incredible as the testimony was from Dr. Naguit, it is just as incredible to the Court that the Respondent failed to present any testimony. We must therefore decide the case without the testimony of Claimant's employer, the State truck driver, and an independent medical examination. This Court, however, cannot postulate as to what should have been presented but must and will decide the case on the evidence before the Court.

There are two issues before the Court, namely liability and damages.

As to the question of liability, the only evidence in the record tends to establish that Respondent's agent operated Respondent's vehicle in a manner that caused it to collide with the rear end of Claimant's vehicle, and that the operation of Respondent's vehicle was the sole and

proximate cause of this accident. There is no evidence *in the record* from which it can be seriously contended that Claimant did, or failed to do, any act which caused or contributed to cause this collision. (Emphasis added.) Without the testimony of the State truck driver or any other witness to try to establish an unavoidable collision or some comparative negligence, we have only the testimony of the Claimant from which to determine the facts.

While a motorist struck from the rear is not always entitled to judgment as a matter of law and the facts of each case must be considered in resolving rear-end collisions, it is the driver approaching another from the rear who has the duty to maintain a safe lookout and it is he who must consider the possibility of having to stop suddenly. (*Economy Fire and Casualty v. State* (1984), 36 Ill. Ct. Cl. 214.) While Respondent disputes liability and asks us to look at the facts of the case, it must be stated again that the State failed to call the truck driver or any other witness to the accident to dispute the Claimant's version. In the *Economy Fire* case, both drivers testified and the Court found some comparative negligence. We only have the Claimant's version in this case and his testimony establishes liability. Claimant bears the burden of proving by a preponderance of the evidence that the State was negligent and that the State's negligence was the proximate cause of Claimant's injury. (*Mackowiak v. State* (1982), 35 Ill. Ct. Cl. 315; *Jager v. State* (1986), 39 Ill. Ct. Cl. 21.) Respondent's driver had a duty to maintain a safe lookout and not drive into the rear end of Claimant's vehicle. Respondent's driver's breach of this duty was the proximate cause of the accident. (*Guffey v. State* (1987), 40 Ill. Ct. Cl. 179.) If Claimant caused this accident or was comparatively negligent, it does not appear in this record.

The issue of damages is a very difficult issue for the Court. The Claimant has the burden of proving his damages with certainty and absent such proof, no award may be entered. (*Harris v. State* (1989), 41 Ill. Ct. Cl. 184.) However, damages are not deemed uncertain merely because they are uncertain as to amount, as distinguished from those which are too uncertain to be recoverable because they are not the certain results of the wrong that has been committed. *J.F. Inc. v. State* (1988), 41 Ill. Ct. Cl. 5.

For the Claimant to recover, the Court must find that Claimant's injuries were caused by the Respondent's negligence by a preponderance of the evidence. There is no question that Claimant had significant medical problems, significant pain and suffering, significant and considerable medical bills, and significant lost wages after September 30, 1986. If we do find that the spinal stenosis and/or the degenerative disc disease and/or the herniated disc and/or the acute low back pain were either caused or aggravated by the collision of September 11, 1986, then we must take the Claimant as we find him for purposes of finding the amount of damages. *Gillmore v. State* (1987), 40 Ill. Ct. Cl. 85.

Additionally, pursuant to Chapter 23, Section 11—22 of the Illinois Revised Statutes, any award must be reduced by $8,943.79 which is the amount proven by the Respondent's exhibit as the amount paid by the Illinois Department of Public Aid for medical assistance for Claimant from June 1, 1987, through March 1, 1989.

In determining damages, this Court preliminarily must determine what injuries were more probably than not proximately caused by the collision of September 11, 1986. Claimant claims injuries to both his neck and back as a result of the accident. After careful consideration of

all the evidence, and all reasonable inferences to be drawn from the evidence, this Court first finds that the Claimant has failed to prove by a preponderance of the evidence that the back injury complained of was proximately caused by the September 11, 1986, accident.

This finding is based upon several factors. First, the impact itself was a low impact collision resulting in only minimal property damage. The Claimant himself admitted that the only damage caused as a result of this collision was a small dent in the rear trunk.

Second, there is no credible medical evidence that the back condition resulting in surgery was more probably than not proximately caused by what occurred on September 11, 1986, when this minimal impact occurred.

It is undisputed that Claimant had a pre-existing back condition, namely spinal stenosis and degenerative disc disease. Dr. Murphy, the neurosurgeon, is in the best position to offer an opinion as to the cause of the condition which he surgically treated. When addressing the causation issue, he stated, "[I] think it is possible that it could have aggravated the pre-existing condition." In fact, Dr. Murphy admits he never had received a history of the accident. He further admits that he could not give any percentage of aggravation caused by the accident since he knew nothing of the accident. Accordingly, this Court finds Dr. Murphy's purported opinion on causation to be speculative. It is without medical basis or foundation.

This Court likewise finds Dr. Naguit's opinion on causation to lack credibility. While he generally states that the pre-existing back condition was aggravated by the accident, it is only a bare assertion on his part without any medical basis or foundation. This Court has already discussed above why any of Dr. Naguit's opinions lack credibility. This

includes his continued treatment of Claimant despite his belief that sending him to Mayo would be the best course to take care of his problems and the fact that he talks about a herniated disc when the treating surgeon makes no mention of the same.

Finally, Claimant's own actions belie a finding that the back condition is in any way related to any trauma suffered in this minor collision on September 11, 1986. The first time Claimant sought any medical treatment at all was 19 days after the accident. He made no complaints of injury at the scene of the accident. When he went 19 days later, he complained only of neck pain. In the interim, he continued to work at his job as a maintenance person at Steak 'n Shake which included heavy lifting.

He continued to treat with Dr. Naguit after he began treatment on September 30, 1986, and again only mentioned problems with his neck. He admitted in cross-examination that he would tell the doctor all of the symptoms he was experiencing. He saw Dr. Naguit on October 8, October 15, November 7 and November 21, 1986, and made no mention of any back problems.

The first time the Claimant ever mentioned a low back problem was when he was seen at the hospital on November 28, 1986. This was nearly two and a half months after the accident. The diagnosis at that time was acute low back pain. Again, in the interim from the accident until this onset of acute low back pain, the Claimant had continued working as a maintenance person.

This Court cannot speculate as to what transpired to cause the Claimant to go to the hospital emergency room to get treatment for an acute low back condition. Neither can this Court speculate that a minor accident two and a half months before, which caused no immediate symptoms

and did not require any medical treatment for a back problem, cause or contribute to cause this subsequent acute back condition. Accordingly, this Court finds that more probably than not the low back condition was not caused by the accident of September 11, 1986.

This Court does find that the injuries more probably than not caused by the September 11, 1986, only relate to Claimant's neck. This Court finds that Claimant has met his burden in this regard and has shown by a preponderance of the evidence that he suffered a cervical strain as a result of the collision. This is the condition for which Claimant first treated with Dr. Naguit. This is the condition which Claimant complained of to the doctor for the first few months. He is entitled to damages for medical expenses reasonably necessary to treat this condition and pain and suffering and disability associated with this aspect of his condition.

In determining the amount of damages to be awarded to Claimant for his neck injury, there is a difficulty in separating out the amount of medical expenses related to treatment of the neck condition alone and the amount of pain and suffering and disability solely associated with the neck condition and not the back condition. However, after a careful review of the evidence and medical bills presented by Claimant, this Court finds that the pain and suffering, disability and reasonable and necessary medical expenses relating to the neck injuries and the vehicle damage require an award in the amount of $35,000. This Court does find that the Claimant failed to properly prove any future medical expenses by a preponderance of the evidence as to any medical condition caused by the September 11, 1986, collision.

As previously stated, this award must be reduced by $8,943.79 pursuant to 305 ILCS 5/11—23. An award is

therefore made to the Claimant, Bernie J. Gildehaus, in the amount of $26,056.21 and the Illinois Department of Public Aid is ordered to be paid $8,943.79 pursuant to 305 ILCS 5/11—23.

## ORDER

FREDERICK, J.

This cause coming on for hearing on Claimant's motion for a new trial or in the alternative, petition for a rehearing, and the Court having reviewed the motion, and the Court being fully advised in the premises, wherefore, the Court finds:

1. That the Court's opinion is not against the manifest weight of the evidence.

2. That Claimant was given a fair trial with the opportunity to present all relevant evidence.

3. That this Court carefully considered the evidence and the credibility of the witnesses in rendering its opinion.

4. Claimant failed to prove by a preponderance of the evidence that the back injury was causally connected to the low impact collision on September 11, 1986.

5. That the alleged new evidence as to future damages (from the date of the trial) is not sufficient evidence to reinstate a new trial but was taken into account by the Court and previously considered by the Court in granting the award the Court made which included future expenses.

6. The evidence and record before this Court did not establish by credible medical evidence that the back injury and all the subsequent care were the result of the accident.

Therefore, it is ordered that the motion for a new trial or in the alternative, petition for rehearing is denied.