(No. 89-CC-3482– )

AMERICAN JANITORIAL SERVICES, INC., Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed February 27, 1998.*
*Order filed May 6, 1998.*

TERRENCE M. JORDAN, for Claimant.

JAMES E. RYAN, Attorney General (MARINA POPOVIC, Assistant Attorney General, of counsel), for Respondent.

## OPINION

FREDERICK, J.

This cause is before the Court on Claimant, American Janitorial Service, Inc.'s, verified complaint seeking $3,400,000 from Respondent, State of Illinois, for wrongful termination of a janitorial contract. Claimant seeks $400,000 for loss of income and $3,000,000 for damage to good will. Jurisdiction is pursuant to section 8(b) of the Court of Claims Act. 705 ILCS 505/8(b). (formerly Ill. Rev. Stat., ch. 37, sec. 439.8(b) (1987)).

The complaint alleges that on June 30, 1988, Respondent entered into a contract for the provision of janitorial services by Claimant at Respondent's building at 100 West Randolph Street, Chicago, Illinois (hereinafter referred to as the "building"). A condition of the contract was that Claimant was required to pay its employees compensation equal to the prevailing wage. On December 29, 1988, Claimant received a letter from Director Tristano of the Department of Central Management Services (hereinafter referred to as the "Department") informing Claimant that its contract was terminated on January 1, 1989, for failure to pay its employees the required prevailing wage. Claimant alleged that it had always paid all of its employees the

prevailing wage and that it demonstrated this to Respondent by letter and supporting documentation submitted to the Department of Labor in September of 1988.

A trial was conducted on May 9, 1997, before Commissioner Hanley. Claimant presented three witnesses, namely Fernando Ortiz, an officer of Claimant, and Peg Morsch and Thomas Tocalis, employees of the Department. Respondent presented four witnesses, namely Peg Morsch, Thomas Tocalis, Michael Masterson and Scott Miller, employees of the Department of Labor.

Prior to the commencement of the hearing, Respondent presented a five-page written motion in limine. Claimant objected to the motion, based upon lack of notice and surprise, having received the motion the morning of the hearing. Claimant contended that section 790.200 of the Court of Claims Regulations provides for 15 days for the filing of an objection to a motion.

The purpose of Respondent's motion was to prevent Claimant from contesting whether the Department of Labor's purported finding that Claimant was not in compliance with the Prevailing Wage Act was correct. The Commissioner ruled that section 790.200 of the regulations does not apply to a motion in limine. The rationale for the ruling was that these motions are generally brought on the eve of trial and are intricately involved in the parties' trial strategies. The Commissioner believes it critical to determine whether there was a hearing at the Department of Labor and Claimant was afforded an opportunity to participate. Additionally, section 11A of the Prevailing Wage Act (hereinafter referred to as the "Wage Act") provides for a procedure of notifying contractors who, on two separate occasions, have been determined to have violated the Act. (Ill. Rev. Stat. 1991, ch. 48, par. 39s—11A.) The contractor then has ten working days to

request a hearing by the Department of Labor. The Director sets a hearing within 30 days.

The motion in limine was correctly denied by the Commissioner because Respondent did not establish that the procedures for determining a violation were ever instituted. Claimant was not provided notice of two prior violations and was not afforded an opportunity to invoke its right to a hearing before the Department of Labor.

### Claimant's Case

Ms. Peg Morsch testified that she was employed as a public service administrator in the Department on all relevant dates. Her duties included the administration of the contract and overseeing the nightly operations of the contract. Ms. Morsch was not involved in the decision to terminate the contract with Claimant. She also received a letter on October 20, 1988, which she understood to mean that Claimant was paying the prevailing wage on a weekly basis, but the fringe benefits were issued on a separate check.

Ms. Morsch was aware that there was a question being raised in 1988 about Claimant not hiring the employees of the previous janitorial service. She did not have any contact with anyone from "Local 25" and was not aware if other State employees had any such contact.

Ms. Morsch orally notified Claimant that it was not required to employ the employees of the previous contract.[1] At the pre-bid conference, Claimant was asked to interview the existing work force as a courtesy; however, their employment was not one of the conditions of the contract. She identified the agreement between the Department and

---

[1] Respondent made a continuing objection to this line of questioning, however, the objection was overruled. Claimant maintained that the State terminated the contract because Claimant did not hire the employees of the prior contractor.

Claimant commencing July 1, 1988, which was Claimant's Exhibit No. 2.

On cross-examination, Ms. Morsch stated that, on or about October 20, 1988, she became aware that the Department of Labor had determined that Claimant was not in compliance with the Act for a period of time. On redirect examination, she acknowledged that she did not give a copy of the letter she received to Claimant.

Mr. Thomas Tocalis testified that he was employed by Respondent as the building manager of the building in 1988. He identified Claimant's Exhibit No. 3 as a letter dated June 30, 1988, sent by him to Ortiz Fernando, transmitting to Claimant a copy of the signed janitorial service contract. He was not aware of any other notice going to Claimant to advise Claimant that it had been awarded the contract. He identified Claimant's Exhibit No. 2 as the contract between the parties to which the June 30th letter refers. The contract was to commence on July 1, 1988. He could not recall any reason why Claimant was sent notice of the award one day prior to the commencement date.

Mr. Tocalis did not recall receiving a copy of Claimant's Exhibit No. 4 which was a December 23, 1988, letter from the Director of the Respondent stating that the contract was terminated as of January 1, 1989. He did not recall when he first became aware that Claimant's contract was going to be terminated. He did not know whether Claimant was paying prevailing wage in December of 1988.

Mr. Tocalis also did not recall having seen Claimant's Exhibit No. 5 which was a December 21, 1988, Department of Labor letter that indicated Claimant had cured any prevailing wage problem. He was not aware of the

identity of the person that made the determination to terminate the contract. It was not necessarily part of his duties to be consulted concerning the cancellation of the cleaning service contract for the building. Either the Director's office or the Bureau of Management's Springfield office told him that the contract was to be awarded. He believes a decision to terminate the contract would be made by the Director. He also thought that Michael Bartoletti, the Bureau Manager, would be the one to make a recommendation to the Director to terminate the contract.

Mr. Fernando Ortiz testified that he was an officer of Claimant in December of 1988. He identified the following documents:

(a) Claimant's Exhibit No. 6, Claimant's bank statement from Metropolitan Bank;

(b) Claimant's Group Exhibit No. 7, a list of copies of payroll checks for employees working in the building for December 9, 1988;

(c) Claimant's Group Exhibit No. 8, a series of payroll checks dated December 30, 1988, for employees working in the building;

(d) Claimant's Exhibit No. 9, a payroll journal;

(e) Claimant's Exhibit No. 9A, a statement of hours worked for each employee in the building;

(f) Claimant's Exhibit No. 10, a payroll journal, dated December 23, 1988;

(g) Claimant's Exhibit No. 10A, the hour statement in relation to the December 23, 1988, payroll.

Mr. Ortiz stated that the contract did not require him to hire the employees of the previous contractors. He

was called on the telephone by Tom Tocalis on June 30, 1988, at approximately 4:00 p.m., and told that Claimant was awarded the contract and cleaning service was supposed to begin in the building at 12:00 a.m. on July 1, 1988. During the first week of July, Mr. Tocalis mentioned to Mr. Ortiz that he should hire the same employees as the previous contractor. Mr. Ortiz told Mr. Tocalis that Claimant would only keep some of the good employees from the previous contractor. He recalled having a subsequent conversation with Mr. Tocalis on the subject. He stated that, in December, 1988, Claimant was paying all the employees the fringe benefits.

On cross-examination, Mr. Ortiz stated that Claimant had one other cleaning contract with the Gould Center in Rolling Meadows which expired. Claimant had a collective bargaining agreement with Local 25 in DuPage County. He acknowledged that the Department complained about the cleaning services in July when Claimant was in the process of putting new people to work. He believed the employees from the previous contractor were engaging in sabotage.

Mr. Ortiz stated on cross-examination that he was not aware that Claimant was being investigated by the Department of Labor regarding alleged Prevailing Wage Act violations. He received a letter dated August 25, 1988, from the Department of Labor requesting documents in relation to Claimant paying fringe benefits to employees. He denied that this led him to believe Claimant was being investigated but acknowledged that there was a concern regarding compliance with the Act.

On redirect examination, Mr. Ortiz identified Claimant's Exhibit No. 11, a letter from Claimant responding to the Department of Labor's August 25, 1988, letter. He identified Claimant's Exhibit No. 11A as the enclosures

referenced in Claimant's response. He stated that Claimant could not renew the contract with Gould Center because "there was too much heat from Local 25." Claimant went out of business after December, 1988, because the contract with the state was terminated. Mr. Ortiz testified that Claimant was paying prevailing wage for the entire period of the contract with the State.

On recross-examination, Mr. Ortiz stated that Claimant had no further communications with the Department of Labor after responding to the August 25, 1988, letter requesting documents. He did not call the Department of Labor after the termination notice in December of 1988. He did call Mr. Tocalis who said he had just learned of the termination and did not know anything about it. Mr. Ortiz also identified Claimant's Exhibit No. 4A as an envelope dated December 27, 1988, in which he received the termination letter on December 30, 1988.

### Respondent's Case

Ms. Peg Morsch explained the process by which the Department requests bids and awards contracts. A prevailing wage certification form was executed by Fernando Ortiz, a representative of Claimant, and is included in the contract. The prevailing wage for Cook County was $9 per hour and $1.15 per hour for fringe benefits.

Claimant was not the lowest responsible bidder and, in fact, it was the fifth bidder. Ms. Morsch recognized Respondent's Exhibit No. 1, a June 3, 1988, letter from the Department of Labor. The Department had requested the Department of Labor to interview bidders to determine whether the companies had paid prevailing wages on other jobs. Claimant was determined to be in compliance with the Act. Respondent's Exhibit No. 1 was not offered into evidence.

On cross-examination, Ms. Morsch stated that the contract does not specify how often the fringe benefits are to be paid, nor does it state how they are to be paid. She did not recall the name of the union with which Claimant was to have a collective bargaining agreement. The determination of whether a bidder has a collective bargaining agreement is a factor the Department considers in its process of awarding a contract.

Mr. Tocalis stated that he did not recall or recognize Respondent's Exhibit No. 2, a September 12, 1988, letter from the Department of Labor addressed to him.

Michael Masterson testified that he has been employed by the Department of Labor since May of 1989, and currently is the manager of the conciliation and mediation division. The division does investigations under the Prevailing Wage Act. He explained the procedures of conducting an investigation of possible violations of the Act which includes requesting payroll documents from the employer, interviewing employees, and conducting an audit. The employer is kept abreast of all findings by the Department of Labor. The contractor is notified in writing if it is not in compliance with the Act. He explained that there are times when the notice of violation is not in writing, such as, when, "you deal directly face to face with the owner" or when "the company is aware of your audit and they would go ahead and pay their workers directly to make up for the differences in wages."

On cross-examination, Mr. Masterson stated that not all investigators kept a log of all oral communications with contractors.

Mr. Scott Miller, the general counsel's chief hearing officer for the Department of Labor (hereinafter referred to as "Labor") was present for the purpose of testifying

about his review of Labor's file and the records produced by Mr. Ortiz. The whereabouts of Mr. Hubbs, the investigator, is unknown and Mr. Hubbs did not testify. Claimant objected to the testimony of Mr. Miller. The objection was overruled and Mr. Miller was allowed to testify but only to matters that he had reviewed in the file.[2]

Mr. Miller stated that he has worked for Labor since 1990. The file presented to Mr. Miller was marked as Respondent's Group Exhibit No. 3. Mr. Miller looked at the payroll records. Respondent's counsel attempted to have the witness testify as to whether the investigator or Labor made a decision regarding whether Claimant was complying with the Act or whether Mr. Miller believed Claimant was paying prevailing wage during the time period in the file. Claimant objected. It was ruled that the witness could testify under these circumstances as to a decision of another employee if that employee documented his decision and that documentation was objectively available for review.

Mr. Miller stated that, based upon his review of the records, Claimant was not initially paying its employees the prevailing wage. David Hubbs found that, for the period of July and August, 1988, Claimant was not paying the fringe portion of the prevailing wage. It was paying the cash portion only. Subsequent to Hubbs' finding, the company paid the workers directly the fringe portion in checks in September, 1988. Mr. Miller could not ascertain from the file what happened between September and November of 1988.

On cross-examination, Mr. Miller was requested to identify any document in Labor's file that contained a finding by Hubbs. An August 31, 1988, two-page memo

---

[2] Although referred to as Labor's file throughout the examination, it became apparent that Labor's actual file no longer existed intact. Respondent's Exhibit No. 3 was ultimately ruled inadmissible.

to David Hayes states, "initial findings indicate contractor has violated." A September 22, 1988, letter to the building manager states that, "as a result of his investigation, Mr. Hubbs—of alleged noncompliance, he advised that CMS authorize the contract payments not to be withheld any further." The September 22, 1988, letter does not use the word, "finding."

Mr. Miller acknowledged that the certified transcript of payroll for July 18 through July 22, 1988, shows payments of $9 per hour and fringe benefits of $1.15 per hour for all employees, except for a supervisor, paid $12 per hour. There appeared to be notes taken by Mr. Hubbs of interviews with employees indicating that they were paid cash only and did not receive fringe benefits. The three pages of handwritten notes were marked as Respondent's Group Exhibit No. 3A. A handwritten letter explaining when the interviews took place was marked as Respondent's Group Exhibit No. 3B. It is the same as the September 12, 1988, typed version. The interviews took place on August 8, 1988, prior to the initial findings and prior to the transmittal from Claimant of the certified payroll. The payroll journals from July 15th through the 22nd show:

"that there is no reflection of a fund. The certified payroll denotes notes on the bottom that if fringe benefit rate is paid into a fund, please not a (sic) by placing the letter F behind the fringe benefit rate. If the fringe benefit rate is included on an employee's payroll check, please note by placing a P behind the fringe benefit rate, but when I look at the current period payroll journal from the [claimant], I don't see that in their payroll journal."

There is no requirement that an employee receive only one payroll check for a particular period. Labor did not specifically ask for copies of checks. There was no subsequent communication from Labor requesting further information or checks from Claimant. There is nothing in Labor's file that would cause Mr. Miller to conclude that Claimant was not paying prevailing wage from

November 15th through the end of December, 1988. Labor's file did not contain a notice of hearing or any documents indicating oral conversations between the investigator and Claimant.

Claimant moved to strike the testimony of Mr. Miller, arguing that he was provided only certain documents which formed an incomplete file to tailor the information, so as to create the result of an opinion sought by the Respondent. Although the motion was denied at the hearing, this Court will limit its consideration of Mr. Miller's testimony to those facts within his personal knowledge.

### Rebuttal Witnesses

Claimant indicated a desire to call rebuttal witnesses; however, none were present and Claimant was not prepared to proceed. Claimant's oral motion to set this matter for another day was denied.[3]

The question before the Court is whether the Director of the Department had the right to terminate the contract. The December 23, 1988, letter from the Director states that the reason for the termination was Claimant's failure to pay its employees the required prevailing wage.

There is no dispute the contract specifies, in paragraph 15, that, pursuant to the Prevailing Wage Act, "the Contractor must pay the prevailing wage rate." The parties agree that the pertinent prevailing wage was $9 per hour and $1.15 per hour for fringe benefits.

The contract contemplates that the contractor may be in breach, and provides, in paragraph 29:

---

[3] It was ruled that Claimant should not have been surprised that Respondent would use the alleged prevailing wage violation as a defense. The documents, Respondent's Exhibit No. 3A, Claimant desired to rebut were ruled inadmissible and it was noted that the Court would narrowly construe Miller's testimony. Claimant was invited to present a motion with a proper showing of an evidentiary basis indicating what testimony the proposed rebuttal witnesses would provide. None was ever filed.

"*Breach*: Failure of the Contractor to perform as specified is cause for immediate termination of the contract at the option of the State."

The contract does not include any provisions whereby the State is obligated to notify the contractor of a default or perceived breach. There are no provisions affording the contractor any opportunity to cure a breach or default. There are no expressions requiring the State to give notice of termination or otherwise act within a specified time frame if it believes the contractor is in breach of its obligations. The contract is silent on whether the State may take action to terminate two to three months after it becomes aware of a breach.

The contract is silent as to what happens if the contractor does cure the breach prior to termination. Although not identified as such by the parties, it may be argued that there is an ambiguity in paragraph 29 because it states that a failure of the contractor is cause for *immediate* termination. The questions would be whether the contract requires *immediate* action, and whether delay operates to cause the State's termination right to expire. In *Albion Carlson & Company v. State* (1996), 48 Ill. Ct. Cl. 245, the Court found in favor of a Claimant contractor on the pertinent issue because Respondent had not acted within a 20-day period as required by the contract. The Court stated that it was clear that the Respondent's right to deny a minority business enterprise waiver request expired after the 20-day period. On a separate, nondeterminative issue, the *Albion* court noted that, an ambiguous contract is construed against the party who drafted it, since he chose the language, and it is therefore responsible for the ambiguity. (48 Ill. Ct. Cl. at 250.) This Court also recognized the rule of *contra proferentem* in *McCarthy Brothers Co., et al. v. State* (1995), 47 Ill. Ct. Cl. 15.

Respondent submits that the contractor was not paying the $1.15 in fringe benefits to its employees for the months

of July and August, 1988. Respondent asserts that the Department of Labor investigated the alleged failure and determined that Claimant had not paid the fringe benefits.

Claimant asserts that Respondent did not determine that it had not paid the fringe benefits. Claimant appears to argue in the alternative that, even if Respondent did determine that it had not paid the fringe benefits to its employees during July and August, 1988, it subsequently did so by separate check. The Respondent does not contest this alternative point. Claimant also maintains, without refutation by the Respondent, that it was in compliance minimally from September, 1988, through December 23, 1988, the date of the letter terminating the contract.

The contract does not expressly require the State to submit the question of a violation of the Act to the Department of Labor for an official finding or determination. The fact that the Department requested Labor to investigate the matter does not contractually prohibit the Department from terminating the contract without a strict compliance with the procedures available to Claimant pursuant to the Act. There is no evidence that Claimant was notified in writing of Labor's or the Department's determination of failure to pay fringe benefits during July and August, until the December 23rd letter, and no-one testified that Claimant was orally informed.

Claimant's evidence is sufficient in its case-in-chief to demonstrate that it was in compliance with the Act. The question is whether the Respondent proved at the hearing that its termination was for cause, namely a failure to pay prevailing wage.[4]

---

[4] Respondent's Exhibit No. 3 contains sufficient evidence to support the conclusion that fringe benefits were not paid; however, it was ruled inadmissible because there was no foundation and it was not included in the Department Report. (Respondent's Exhibit No. 5) The investigator did not testify. Two labor employees who began their employment after December 31, 1988, attempted to authenticate the file. More importantly, it was revealed by Respondent's counsel that Respondent's Exhibit No. 3 was not the actual and complete Labor file but was a file that she created or from which she had at least removed certain documents.

The October 20th and December 21st letters contained in Respondent's Exhibit No. 5 are sufficient to support a finding that Claimant was not in compliance with the Act in July and August. The issue then is whether or not the State had the authority to terminate the contract in December for violations in July and August.

Claimant's position would be that Respondent's right to terminate for a July/August breach had expired before December 23rd, and Respondent could not terminate the contract pursuant to paragraph 29 of the contract. This position is supported by the fact that apparently Claimant cured the violation and the Respondent did not act on the cause for immediate termination. We find that Respondent did not have the right to immediately terminate the contract on December 23, 1988.

The Claimant has the duty to prove his damages by a preponderance of the evidence. This burden applies in a contract case as well as in a negligence case. *Gildehaus v. State* (1993), 46 Ill. Ct. Cl. 176.

On the issue of damages, it appears that the contract specifies that Claimant was to be paid $51,896 per month. This appears to be a gross amount and there is no evidence in the record in relation to Claimant's profit on such payment.

The Claimant presented absolutely no evidence regarding the value of the goodwill of the company to support its claim for $3,000,000 for damage to its goodwill. No experts or professionals testified to the value of Claimant's goodwill, or any damages to that goodwill. Therefore, Claimant's request for $3,000,000 in damages to Claimant's goodwill is denied for lack of any supporting proof.

The issue of Claimant's claim for $400,000 for loss of income is also very difficult for the Court because Claimant

presented very little proof as to its loss of income. The Claimant only proved the monthly payment due of $51,896 under the contract. There was no proof presented as to net income or Claimant's efforts to mitigate its damages. There is some merit to an argument that the Court could deny this claim on the basis of Claimant's failure to prove its damages by a preponderance of the evidence. Additionally, the contract, in paragraph 36, also authorizes the State the unilateral right, without cause, to cancel the contract upon 30 days written notification. Neither party has addressed this provision and its potential applicability to the issues.

We find that the Respondent had the unilateral right to cancel the contract with 30 days' notice, and the December 23, 1988, letter effectuated that right. The Court finds that, by virtue of the notice mailed on December 27, 1988, and received by Claimant on December 30, 1988, the contract was terminated, effective January 31, 1989. Claimant should receive the benefit of the 30-day written notice prior to cancellation.

As we find that the contract was canceled rather than terminated, we find that Claimant would be due the amount of $51,896 for the month of January, 1989, for which it was not paid. Claimant has failed to prove any other damages by a preponderance of the evidence.

Our inquiry does not end here. Neither party presented evidence as to whether any funds lapsed under the contract. In a contract case, this Court is limited to an award of damages equal to the amount of lapsed funds. *Global Fire Protection Co. v. State* (1994), 46 Ill. Ct. Cl. 195; *Altman v. State* (1991), 44 Ill. Ct. Cl. 8.

Based on the foregoing, it is the order of the Court as follows:

A. That the Respondent shall file a notice with the Court indicating what amount of funds lapsed under the contract or which could be transferred into the line item for this contract.

B. That the Court will enter a final order upon the Department filing the lapsed funds information.

## ORDER

FREDERICK, J.

This cause comes on to be heard on the Court's own motion following receipt of the Respondent's response to the decision entered herein on February 27, 1998. The Court finds:

In the aforesaid opinion damages were found to be $51,896 but judgment was withheld pending filing of certain financial data. Respondent has since filed the necessary information. Sufficient GRF money lapsed to cover an award.

It is therefore ordered that the Claimant be, and hereby is, awarded $51,896.